[No. B234955. Second Dist., Div. Two. May 8, 2012.]

VAN DE KAMPS COALITION, Plaintiff and Appellant, v.
BOARD OF TRUSTEES OF LOS ANGELES COMMUNITY COLLEGE
DISTRICT et al., Respondents;
CITY OF LOS ANGELES et al., Real Parties in Interest.

1038

**COUNSEL**

The Law Office of Daniel Wright and Daniel E. Wright for Plaintiff and Appellant.

Gresham Savage Nolan & Tilden, John C. Nolan, Jennifer M. Guenther and Stefanie G. Field for Respondents.

**OPINION**

**DOI TODD, J.**—Plaintiff and appellant Van de Kamps Coalition filed a petition for writ of mandate and complaint for declaratory relief against respondents the Board of Trustees of Los Angeles Community College District (Board) and the Los Angeles Community College District (LACCD), alleging that the Board and the LACCD failed to comply with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) in connection with the leasing of a campus site. The trial court sustained the demurrer without leave to amend on the ground that the action was time-barred.

We affirm. The decisions made in 2010 that appellant challenged in the petition and complaint were actions toward the implementation of a 2009 project approval and did not trigger the running of a new limitations period under Public Resources Code section 21167, subdivision (d).

## FACTUAL AND PROCEDURAL BACKGROUND

On appeal from a judgment of dismissal following a demurrer sustained without leave to amend, we assume the truth of all well-pleaded facts, as well as those that are judicially noticeable, but not contentions, deductions or conclusions of fact or law. (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 814 [107 Cal.Rptr.2d 369, 23 P.3d 601]; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

*The First CEQA Action*

Appellant is an unincorporated association whose members first came together to save the historic Van de Kamps Bakery Building (Building or site) when a real estate developer proposed to demolish it and build a Home Base store. After the City of Los Angeles (City) prepared and certified an environmental impact report (EIR) for the project, the City Planning Commission denied approval. Appellant supported the LACCD's acquisition of the site for the development of a satellite campus for Los Angeles City College. The LACCD completed the purchase of the two-acre site in 2001 through the issuance of Proposition 39 bonds.

During the next several years, the LACCD worked toward the construction and opening of a $72 million community college campus, comprised of the rehabilitated Building used for art studios and other classrooms and a new education building housing classrooms and a library. An EIR update and two addenda were prepared to analyze the environmental impacts of a satellite community college campus. Due to the state budget crisis, the LACCD realized by 2008 that it would be financially unable to operate the facility as a full satellite campus. But it recognized that there were a number of existing education and service providers that had the ability to operate on the site and present a comprehensive program of classes and training that could meet the community's educational needs. In order to use the site for educational purposes, on July 15, 2009, the Board adopted resolutions which approved an interim use of the property and authorized a five-year lease of part of the Building to an outside tenant (Resolutions).

By way of the Resolutions, the Board determined, found and ordered that for a period of five years Los Angeles City College would have no programmatic or administrative responsibility for the operation of the facilities that had been constructed at the site; effective immediately, for a period of five years the LACCD would assume those responsibilities; the complex at the site would be renamed the Los Angeles Community College District Van de Kamp Innovation Center; and "[t]he District Office shall make the LACCD Van de Kamp Innovation Center space available on a rental basis to a variety

of service and educational entities to meet the needs of the community and fully cover the costs of operation and maintenance on a day-to-day basis, subject to approval by the Board of Trustees." At the same time, the Board authorized a five-year lease agreement with the Alliance for College-Ready Public Schools (Alliance) at the site. At the Board meeting the LACCD indicated that additional environmental review for the lease was unnecessary because the site would have the same functionality that was originally planned and reviewed in the EIR update and addenda.

Also in 2009, the Board took certain actions in furtherance of the Resolutions. On November 4, 2009, the Board approved a $400,000 expenditure to Quatro Design Group for the purpose of redesigning the Building to meet the needs of the proposed new tenants. Further, on December 16, 2009, the Board approved the purchase of a neighboring property from the Portola Group (Portola Purchase Agreement); LACCD staff reported that the land was not for any particular project and the LACCD had no " 'current plans' to develop the land . . . ."

On January 11, 2010, appellant filed a petition for writ of mandate (CEQA I) seeking declaratory and injunctive relief against the LACCD and others, challenging the adequacy of CEQA review for the July 15, November 4 and December 16, 2009 project approvals. Appellant alleged: "The actions on July 15, 2009 and November 4, 2009 were taken without any effort by the LACCD or its Board of Trustees to assess the potential significant environmental impact of the major changes being made to the land uses at the VdK Campus. For the action on December 16, 2009, contrary to substantial evidence in the record, the Board of Trustees adopted a resolution falsely claiming that the purchase of the land was 'exempt from CEQA' because the LACCD has 'no current plans' for the land."

*The Instant CEQA Action*

Following the filing of CEQA I, the LACCD undertook additional actions in furtherance of the Resolutions. On May 26, 2010, the Board approved a lease with the City for a portion of the Building to be used for employment retraining. In July 2010 and again in October 2010, some of appellant's members as individuals filed separate taxpayer petitions under Proposition 39 challenging the same actions alleged in CEQA I. (See *Jackson v. Los Angeles Community College Dist.* (Super. Ct. L.A. County, 2011, No. BS127587); *Folsom v. Los Angeles Community College Dist.* (Super. Ct. L.A. County, 2011, No. BS128994).)[1] On August 25 and October 6, 2010, the Board

---

[1] The trial court ultimately sustained the LACCD's demurrer without leave to amend to the *Folsom* action on the ground it was untimely under the 60-day limitations period in the

approved a first and second amendment, respectively, to the Portola Purchase Agreement which added indemnification provisions related to the filing of CEQA I and the taxpayer actions. Finally, on November 3, 2010, the Board approved an amendment to the contract with Quatro Design Group for additional architectural services to meet the needs of new tenants.

The trial court denied appellant's motion for leave to file a second amended petition in CEQA I to include claims based on the LACCD's actions undertaken in 2010, which appellant claimed it discovered during the preparation of the administrative record. On November 19, 2010, appellant filed a second petition for writ of mandate and complaint for declaratory relief (CEQA II), and filed the operative first amended petition and complaint in February 2011.[2] Appellant characterized CEQA II as a "companion" to CEQA I and filed a notice of related cases for all four actions. Appellant alleged that the discretionary decisions made in 2009 were the subject of CEQA I and challenged the 2010 decisions as being null and void because of the LACCD's failure to undertake the requisite environmental review.

### Demurrer and Judgment

Initially, the trial court sustained with leave to amend the unopposed demurrer filed by the LACCD and the Board.[3] The LACCD thereafter demurred to the operative CEQA II petition on the grounds it was time-barred and duplicative, and failed to state a claim. It argued that the limitations period for a CEQA claim was triggered by the Resolutions, not by subsequent actions taken as a result and in furtherance of the Resolutions. In support of the demurrer the LACCD sought judicial notice of pleadings and motions in other cases, Board resolutions and minutes, and correspondence from public officials.

Appellant opposed the demurrer, arguing that the LACCD did not commit itself to a particular course of action until the later approvals in 2010. It also objected to judicial notice of correspondence.[4] Before the demurrer was heard, it also moved to consolidate CEQA I and CEQA II, and the LACCD opposed the motion.

validation statutes (Code Civ. Proc., § 860 et seq.), and a demurrer was pending on the *Jackson* matter at the time of the hearing in this case.

[2] Appellant also named as real parties in interest the City of Los Angeles; Community Career Development, Inc.; Worker Education and Resource Center, Inc.; Catholic Charities; Los Angeles City College Workforce Development Division; Quatro Design Group; and Portola Ventures, Inc., none of which are parties to this appeal.

[3] Unless separate references are necessary for clarity, hereafter the LACCD and the Board will be referred to singularly as the LACCD.

[4] Though the record does not reflect the trial court's ruling on the LACCD's judicial notice request, the trial court's specific reference to certain documents in the statement of decision, coupled with handwritten notations on the request, suggest that the trial court took judicial notice of all documents except correspondence.

The trial court sustained the demurrer without leave to amend, ruling that "the 180-day limitations period began to run with the approval by the board of the leasing of the campus to non-community college activities and not with the execution of the lease with the City of Los Angeles. Although the July 15, 2009 resolutions stated that the execution of any lease would be subject to the board's approval, such reservation and subsequent approval do not constitute a substantial change in the *project* as is necessary to trigger a new 180-day limitations period." The trial court specifically rejected appellant's multiple arguments that subsequent project decisions triggered a new limitations period, ruling that "[b]ecause the May 26, 2010, August 25, 2010, October 6, 2010 and November 3, 2010 decisions each relate back and are part of the decisions made on July 15, 2009, December 15, 2009 and November 4, 2009, respectively, the actions based on the 2010 decisions are barred by the statute of limitations. Moreover, because each of the 2009 decisions is the subject of litigation in CEQA I, the present actions are duplicative, which is also grounds for dismissal." Finally, the trial court denied the motion to consolidate, explaining that CEQA I was ready for trial and CEQA II had been dismissed.

Judgment was entered in June 2011 and this appeal followed. In September 2011, the trial court granted in part and denied in part the CEQA I petition, ruling that the change in tenants resulting from the Resolutions created the reasonable possibility of increased traffic impacts requiring environmental review but that the purchase of property from the Portola Group did not require further CEQA analysis.

## DISCUSSION

Appellant contends the trial court erred in sustaining the demurrer without leave to amend, asserting that the allegations in CEQA II did not show on their face that the action was time-barred. We find no merit to this contention.

I. *Standard of Review.*

We review de novo a trial court's sustaining of a demurrer, exercising our independent judgment as to whether the complaint alleges sufficient facts to state a cause of action. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171].) We assume the truth of properly pleaded allegations in the complaint and give the complaint a reasonable interpretation, reading it as a whole and with all its parts in their context. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967 [9 Cal.Rptr.2d 92, 831 P.2d 317].)

██ " 'The defense of statute of limitations may be asserted by general demurrer if the complaint shows on its face that the statute bars the action.' [Citations.]" (*E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal.App.4th 1308, 1315 [64 Cal.Rptr.3d 9]; accord, *Lee v. Los Angeles County Metropolitan Transportation Authority* (2003) 107 Cal.App.4th 848, 854 [132 Cal.Rptr.2d 444] [" 'A general demurrer based on the statute of limitations is only permissible where the dates alleged in the complaint[1] show that the action is barred by the statute of limitations.' "].) " 'The ultimate question for review is whether the complaint showed *on its face* that the action was barred by a statute of limitations, for only then may a general demurrer be sustained and a judgment of dismissal be entered thereon.' [Citation.]" (*E-Fab, Inc. v. Accountants, Inc. Services, supra*, at p. 1316.)

We apply the abuse of discretion standard in reviewing a trial court's denial of leave to amend. (*Blank v. Kirwan, supra*, 39 Cal.3d at p. 318.) It is the appellant's burden to show either that the trial court erred in sustaining the demurrer or abused its discretion in denying leave to amend. (*Kong v. City of Hawaiian Gardens Redevelopment Agency* (2002) 108 Cal.App.4th 1028, 1038 [134 Cal.Rptr.2d 260].) We may affirm the judgment if the complaint is objectionable on any of the grounds raised by the demurrer. (*Soliz v. Williams* (1999) 74 Cal.App.4th 577, 585 [88 Cal.Rptr.2d 184].)

II. *The Trial Court Properly Sustained the Demurrer Without Leave to Amend on the Ground That Appellant's Petition Was Time-barred.*

A. *180-day Limitations Period.*

In its petition, appellant alleged that the LACCD's 2010 actions in furtherance of the Resolutions should be declared null and void because the LACCD failed to assess the potential significant environmental impacts resulting from the proposed changes in land use. Accordingly, appellant sought an order "compelling the LACCD to comply with CEQA and to prepare and approve a legally adequate supporting environmental document prior to consideration of any new resolutions, legislative actions or approvals concerning the proposed changes in use of the Northeast Satellite Campus to Los Angeles City College at the historic Van de Kamps Bakery."

Public Resources Code section 21167, subdivision (d), provides that "[a]n action or proceeding alleging that a public agency has improperly determined that a project is not subject to [CEQA] . . . shall be commenced within 35 days from the date of the filing by the public agency . . . of . . . notice [of the determination]." However, where, as here, no such formal notice has been filed, "the action or proceeding shall be commenced within 180 days from the date of the public agency's decision to carry out or approve the project . . . ."

(*Ibid.*; see Cal. Code Regs., tit. 14, § 15112, subd. (c)(5).)[5] The parties do not dispute that the 180-day limitations period applies to appellant's CEQA II petition.

█ The limitations period starts running on the date the project is approved by the public agency and is not retriggered on each subsequent date that the public agency takes some action toward implementing the project. (*Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 105–106 [56 Cal.Rptr.3d 728] (*Megaplex-Free Alameda*); see Guidelines, § 15378, subd. (c).) The court in *Committee for a Progressive Gilroy v. State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847, 863 [237 Cal.Rptr. 723], explained: "It is true that a project, by definition, includes '[a]ctivities involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies.' [Citation.] But it is equally true that a project 'means the whole of an action, which has a potential for resulting in a physical change in the environment . . . .' [Citation.] It refers to the underlying activity which may be subject to approval by one or more governmental agencies; it does not refer to each of the several approvals sequentially issued by different agencies. 'The term "project" does not mean each separate governmental approval.' [Citations.]"

To illustrate, in *City of Chula Vista v. County of San Diego* (1994) 23 Cal.App.4th 1713 [29 Cal.Rptr.2d 89] (*Chula Vista*), the city filed a petition for writ of mandate seeking environmental review of a lease agreement between the county and Aptec, the operator of a hazardous waste facility in the city. In 1989, the county's board of supervisors approved and authorized its contracting director to enter into negotiations with Aptec's parent corporation and, subject to successful negotiations and the determination of a fair price, awarded a five-year service contract. (*Id.* at pp. 1716–1717.) At the same time, the county determined that its approval was categorically exempt from CEQA. (23 Cal.App.4th at p. 1717.) In January 1992, the county and Aptec executed a lease agreement, and the city filed its petition six months later. (*Ibid.*) The trial court sustained the county's and Aptec's demurrer without leave to amend and the appellate court affirmed, holding that the 180-day limitations period applied to bar the action, "because the facts alleged in the City's petition, as read in conjunction with judicially noticeable facts, clearly show that the 'project' (i.e., the agreement) was approved by the County on November 28, 1989, and the actual agreement executed on

---

[5] Regulations guiding application of CEQA are found in title 14 of the California Code of Regulations, section 15000 et seq. They are often, and hereafter will be, referred to as the Guidelines. " 'In interpreting CEQA, we accord the Guidelines great weight . . . .' [Citation.]" (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 319, fn. 4 [106 Cal.Rptr.3d 502, 226 P.3d 985].)

January 29, 1992, was not substantially different from the original 'project.' Accordingly, the 180-day limitations period began to run on November 28, 1989, and expired 180 days later, barring the City's petition which was not filed until July 22, 1992." (*Id.* at p. 1720.)

### B. *Appellant Filed Its Petition More Than 180 Days After Project Approval.*

We agree with the trial court's reliance on *Chula Vista, supra,* 23 Cal.App.4th 1713. The trial court ruled that the facts alleged were substantially similar to those in *Chula Vista* and determined that the 180-day limitations period began to run with the LACCD's approval of the leasing of the site to non-community-college entities and not with the subsequent execution of a lease. The trial court further found that the limitations period was not affected by the qualification that any lease would be subject to the Board's approval, as any reservation and subsequent approval did not amount to a substantial change in the project sufficient to trigger a new 180-day limitations period.

 A "project" under CEQA is defined as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] . . . [¶] (b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Pub. Resources Code, § 21065.) According to the CEQA Guidelines, a "project" refers to the activity that is being approved, which may include multiple discretionary approvals by governmental agencies. (Guidelines, § 15378, subd. (c).) "The term 'project' does not mean each separate governmental approval." (*Ibid.*) " 'This definition ensures that the action reviewed under CEQA is not the approval itself but the development or other activities that will result from the approval.' [Citation.]" (*Megaplex-Free Alameda, supra,* 149 Cal.App.4th at p. 106.)

 Correspondingly, " '[a]pproval' means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person. The exact date of approval of any project is a matter determined by each public agency according to its rules, regulations, and ordinances. Legislative action in regard to a project often constitutes approval." (Guidelines, § 15352, subd. (a).) In *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 134 [84 Cal.Rptr.3d 614, 194 P.3d 344] (*Save Tara*), the California Supreme Court confirmed that a

project may be approved for the purpose of CEQA "even though further discretionary governmental decisions would be needed before any environmental change could occur." There, the court rejected the argument that approval of a private project for CEQA purposes was limited to an unconditional agreement by the agency which irrevocably vested development rights, reasoning that "[s]uch a rule would be inconsistent with the CEQA Guidelines' definition of approval as the agency's '*earliest* commitment' to the project. [Citation.] Just as CEQA itself requires environmental review before a project's approval, not necessarily its *final* approval [citations], so the guideline defines 'approval' as occurring when the agency *first* exercises its discretion to execute a contract or grant financial assistance, not when the *last* such discretionary decision is made." (45 Cal.4th at p. 134.) The *Save Tara* court emphasized that the policies behind CEQA are served by early environmental review. (45 Cal.4th at p. 136 ["the agency's reservation of CEQA review until a later, final approval stage is unlikely to convince public observers that before committing itself to the project the agency fully considered the project's environmental consequences"].)

Here, the trial court properly determined that the July 15, 2009 Resolutions constituted the project approval for the purpose of CEQA review. At that time, the LACCD demonstrated its commitment to a project by directing that the LACCD "shall make the [site] available on a rental basis to a variety of service and educational entities" and authorizing the LACCD to negotiate and enter into a five-year lease agreement with Alliance. Appellant's representatives were present at the meeting when the LACCD adopted the Resolutions, and expressed their concern about the lack of environmental review given the impacts triggered by the change in land use. Also in 2009, the LACCD approved a discretionary expenditure of $400,000 to the Quatro Design Group for the purpose of redesigning the Building interior and providing other services related to the implementation of the changed use of the Building. Over appellant's objection, the LACCD additionally approved a resolution committing itself to the Portola Purchase Agreement, involving the acquisition of an adjacent property from the Portola Group.

The LACCD's actions in 2009 constituted approval of a project, triggering the 180-day limitations period in Public Resources Code section 21167, subdivision (d), which means appellant's November 2010 petition was untimely. (See *Megaplex-Free Alameda, supra*, 149 Cal.App.4th at pp. 105–106 [city's resolution authorizing approval of a disposition and development agreement was a project approval for statute of limitations purposes, even though the agreement was thereafter subject to a number of discretionary approvals]; *Chula Vista, supra*, 23 Cal.App.4th at p. 1720 [resolution authorizing county staff to negotiate and award an agreement was a project approval for statute of limitations purposes].)

We are not persuaded by appellant's efforts to avoid this result. Appellant contends that a new limitations period was triggered by the May 2010 execution of the lease to outside entities, because it was only at that point the previously identified traffic impacts would be realized. But as the trial court recognized, those impacts had already been identified in connection with the Resolutions, and the execution of the lease therefore did not constitute a substantial change in the original project triggering a new limitations period. (See *Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 939 [231 Cal.Rptr. 748, 727 P.2d 1029] ["if the agency makes substantial changes in a project after the filing of the EIR and fails to file a later EIR in violation of [Public Resources Code] section 21166, subdivision (a), an action challenging the agency's noncompliance with CEQA may be filed within 180 days of the time the plaintiff knew or reasonably should have known that the project under way differs substantially from the one described in the EIR"].) According to the statement of decision: "Petitioner argues that a traffic analysis in an e-mail by Richard Brand, Respondent's construction manager, shows that both the Alliance lease and the City of Los Angeles lease will result in an increase in traffic congestion during peak hours, which is a change to the physical environment requiring a new environmental review under CEQA. However, the e-mail discussion to which Petitioner cites occurred in May and July 2009 prior to the July 15, 2009 decision and, therefore, cannot reasonably form the basis for Petitioner to allege that substantial changes were made after the date Respondent's board approved the leasing of the campus. [Citation.] As a result, Petitioner fails to allege how the May 26, 2010 decision substantially changed the project."

On appeal, appellant argues that the May and July 2009 evaluation of traffic impacts was offered not to show a substantial change in the project, but rather, to show that the LACCD's obligation to conduct an environmental review of those impacts was not triggered until it committed itself to a particular course of action by entering into a lease. Appellant relies on *City of Vernon v. Board of Harbor Comrs.* (1998) 63 Cal.App.4th 677, 690 [74 Cal.Rptr.2d 497], disapproved in *Save Tara, supra,* 45 Cal.4th at page 131, footnote 10, where the court held that a city complied with CEQA by not initiating environmental review at the time it entered into a letter of intent for a project but instead waiting until after federal approval. The *Save Tara* court expressly rejected the principles set forth in *City of Vernon,* declining to limit project approval for CEQA purposes to an agency's "unconditional agreements irrevocably vesting development rights" or an agreement " 'to be legally bound to take that course of action.' [Citation.]" (*Save Tara, supra,* at p. 134.) The court explained that "[o]n this theory, any development agreement, no matter how definite and detailed, even if accompanied by substantial financial assistance from the agency and other strong indications of agency

commitment to the project, falls short of approval so long as it leaves final CEQA decisions to the agency's future discretion. [¶] Such a rule would be inconsistent with the CEQA Guidelines' definition of approval as the agency's '*earliest* commitment' to the project. [Citation.]" (*Ibid.*) The court emphasized that CEQA "approval" typically occurs when an agency initially exercises its discretion to enter into a contract or provide monetary support—not when the last decision is made. (*Save Tara*, at p. 134.) According to *Save Tara*, the Resolutions approving an interim use of the Building, directing the LACCD to make the Building available for lease to outside entities and authorizing a lease with Alliance—not the May 26, 2010 lease agreement—constituted a project approval triggering the commencement of the 180-day limitations period.[6]

Appellant also takes issue with the trial court's reliance on *Chula Vista, supra*, 23 Cal.App.4th 1713, arguing that differences in terminology render that case distinguishable. The trial court characterized the Resolutions as authorizing the LACCD to "negotiate and enter into a five-year lease" with Alliance and to "negotiate and enter into other leases with non-community college entities." Appellant points out that while the resolution in *Chula Vista* authorized staff to "negotiate *and* 'award' " the agreement, here the Resolutions authorized the LACCD staff to make the space available for rent, "subject to approval by the Board of Trustees." (*Chula Vista, supra*, at p. 1720.) In our view, the inclusion of Board approval does not change the applicability of *Chula Vista*, as Board approval was merely one of the additional steps that the LACCD intended to take in implementing its project approval. (See generally *Save Tara, supra*, 45 Cal.4th at p. 134 [citing cases where a project approval occurred even though "further discretionary governmental decisions would be needed before any environmental change could occur"].)

In any event, rather than relying on the language of the resolution in *Chula Vista, supra*, 23 Cal.App.4th 1713, the trial court here merely tracked the allegations of appellant's petition in summarizing the Resolutions. Appellant alleged that "on July 15, 2009, the Board entered into a second resolution that authorized the LACCD Administration to negotiate and enter into a 5-year lease of a portion of the VDK Campus to the Alliance for College Ready Public Schools, a charter high school. This lease, a legally binding commitment for at least 5 years with multiple options to renew for more years, was the first in a series of incremental discretionary actions of the Board to convert the VDK Campus into a multi-tenant leased facility." These allegations confirm that the trial court properly concluded that project approval

---

[6] We note that the trial court's subsequent ruling in CEQA I confirms that the July 2009 Resolutions constituted project approval triggering the need for environmental review.

occurred in 2009. (See *Chula Vista, supra,* at p. 1720 [resolution approving and authorizing county staff to negotiate and award an agreement triggered limitations period].)

Appellant further contends that the LACCD's subsequent approvals in 2010 were each separate projects triggering a new limitations period. First, it contends that the inclusion of indemnification against CEQA I and the taxpayer lawsuits by amendments to the Portola Purchase Agreement was a subsequent project approval. Appellant alleged that in December 2009, the LACCD "approved a resolution legally committing itself to acquisition of the Portola/Denny's Property," expressly finding that the approval was exempt from CEQA. With respect to the amendments adding indemnification provisions, appellant further alleged: "The proposal to indemnify Portola in order for the purchase of the Portola/Denny's property to move forward is a project within the meaning of CEQA because without the discretionary commitment of $500,000 in additional taxpayer funds, the purchase of the Portola/Denny's Property could not be completed."

The trial court properly determined that "the project is the purchase of the Portola Property and the addition of indemnification provisions are merely steps in furtherance of such project" that did not substantially change the overall project. Though appellant argues that the LACCD's commitment of additional funds amounted to a separate project, the court in *Citizens to Enforce CEQA v. City of Rohnert Park* (2005) 131 Cal.App.4th 1594, 1601 [33 Cal.Rptr.3d 208], reached a contrary conclusion, explaining that the authorization of a funding mechanism for future improvements is not a "project" within the meaning of CEQA. (See *Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464, 474 [11 Cal.Rptr.2d 792] [resolution forming a community facilities district as a means of raising funds for use in the future was not " 'an essential step culminating in action which may affect the environment' "].) Similarly, the addition of indemnification provisions and the identification of a source of funding for potential indemnification did not constitute a separate project. At best, the amendments were an agency action designed to implement the Portola Purchase Agreement and, as such, did not retrigger the 180-day limitations period. (Guidelines, § 15378, subd. (c); *Megaplex-Free Alameda, supra,* 149 Cal.App.4th at p. 106.)

Second, appellant alleged that on November 4, 2009, the LACCD approved an additional $400,000 for the Quatro Design Group to design construction changes. It further alleged that in connection with its November 2010 proposal to increase the Quatro Design Group contract by $298,416, the LACCD secretly approved the enclosure of a balcony to construct three rooms for workforce unemployment program tenants (balcony project) and

the construction of an additional entrance lane to the Building (driveway project). Again, appellant argues that the 2010 approval of the balcony project and driveway project triggered a new 180-day limitations period.

The trial court soundly rejected this argument, ruling that appellant "fails to allege how the addition of these design services and construction matters substantially changed the overall project, *i.e.*, the renovation of the Van de Kamps Bakery building. Further any incidental and subsequent approvals such as interior remodeling or construction change orders are not 'projects' in and of themselves for purposes of CEQA, and cannot be properly treated as additional causes of action." It concluded that neither the balcony project nor the driveway project triggered a new limitations period. We agree. As explained in *Simi Valley Recreation & Park Dist. v. Local Agency Formation Com.* (1975) 51 Cal.App.3d 648, 663 [124 Cal.Rptr. 635]: "CEQA was not intended to and cannot reasonably be construed to make a project of every activity of a public agency, regardless of the nature and objective of such activity. Such a construction would invoke the expensive and time-consuming procedures required to complete at least a negative declaration in respect of virtually every action of a public agency. It is difficult to conceive of any such action which could not have 'a potential for significant environmental effect' (the state guideline standard for determining when a project requires a negative declaration or an EIR)." (Fn. omitted.) Here, appellant failed to allege what additional or changed impacts resulted from the 2010 balcony project and driveway project that had not already been considered in connection with the 2009 changes to the Quatro Design Group contract.[7]

While CEQA's substantive provisions are interpreted broadly to implement the legislative intent of strong environmental protection, this "does not mean that the same standard of liberality should necessarily be applied in interpreting the procedural requirements of [CEQA]." (*Board of Supervisors v. Superior Court, supra*, 23 Cal.App.4th at p. 836.) CEQA "contains a number of provisions evidencing the clear 'legislative determination that the public interest is not served unless challenges under CEQA are filed promptly' . . . ." (*Board of Supervisors*, at p. 836.) "[T]here is legislative concern that CEQA challenges, with their obvious potential for financial prejudice and disruption, must not be permitted to drag on to the potential serious injury of the real party in interest." (*Id.* at p. 837; see *San Franciscans for Reasonable Growth v.*

---

[7] Appellant's allegations preclude it from relying on an exception to strict adherence to the 180-day time limit where a public agency "attempt[s] to hide changes in approved projects and then claim[s] invulnerability from suit based on the short limitations period." (*Board of Supervisors v. Superior Court* (1994) 23 Cal.App.4th 830, 838 [28 Cal.Rptr.2d 560].) Though appellant alleged that the LACCD "secretly approved two other projects to modify" the Building—the balcony project and the driveway project—it further alleged that it discovered the approvals in March 2010, more than 180 days before it filed the CEQA II petition.

*City and County of San Francisco* (1987) 189 Cal.App.3d 498, 504 [234 Cal.Rptr. 527] ["the rationale of the statutory scheme is to avoid delay and achieve prompt resolution of CEQA claims"].) Where the law is clear, the strict CEQA time requirements must be applied as written. (*Board of Supervisors v. Superior Court, supra,* at p. 837.) Because appellant's allegations on their face showed that the LACCD's project approval occurred more than 180 days before appellant filed its CEQA II petition, the trial court properly determined that the action was untimely under Public Resources Code section 21167, subdivision (d).[8]

### C. *The Trial Court Properly Exercised Its Discretion in Denying Leave to Amend.*

██ Appellant did not oppose the LACCD's first demurrer and instead elected to file an amended petition and complaint. Neither in its opposition to the demurrer nor on appeal has appellant suggested how it might further amend its petition and complaint to avoid the statute of limitations bar. Appellant bears the burden of demonstrating the manner in which its petition and complaint might be amended and showing how that amendment would change the legal effect of the pleading. (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737]; *Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 411 [129 Cal.Rptr.3d 895].)

In view of appellant's failure to meet its burden, we are guided by *Delgado v. American Multi-Cinema, Inc.* (1999) 72 Cal.App.4th 1403, 1409 [85 Cal.Rptr.2d 838], where the court declined to permit the plaintiffs leave to file a second amended complaint, explaining: "When the trial court sustained respondent's first demurrer, it did so with leave to amend, inviting appellants to plead their best possible case in a first amended complaint. Presumably, appellants' first amended complaint reflects their acceptance of the court's invitation. In seeking leave to file yet another amended complaint, appellants do not identify anything more they can add to the allegations they have already made. Accordingly, further leave is inappropriate. [Citation.]"

---

[8] In view of our conclusion, we need not address the alternative ground relied on by the trial court that CEQA II was duplicative of CEQA I. (See Code Civ. Proc., § 430.10, subd. (c) [authorizing demurrer on the ground "[t]here is another action pending between the same parties on the same cause of action"].) Nor need we address the LACCD's argument raised for the first time on appeal that appellant's action is untimely under the validation statutes, Code of Civil Procedure section 860 et seq. (See *Bridgeford v. Pacific Health Corp.* (2012) 202 Cal.App.4th 1034, 1041 [135 Cal.Rptr.3d 905] [appellate court may not affirm a special demurrer on a ground not ruled on by the trial court].)

## DISPOSITION

The judgment is affirmed. The LACCD is entitled to its costs on appeal.

Boren, P. J., and Ashmann-Gerst, J., concurred.